# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAIME C.,[1] | ) NO. CV 17-7049-KS |
| Plaintiff, | ) |
| v. | ) MEMORANDUM OPINION AND ORDER |
| | ) |
| NANCY A. BERRYHILL, Acting | ) |
| Commissioner of Social Security, | ) |
| Defendant. | ) |
| _____ | ) |

## INTRODUCTION

Jaime C. ("Plaintiff") filed a Complaint on September 25, 2017, seeking review of the denial of his application for a period of disability and disability insurance ("DI"). On November 6, 2017, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge. (Dkt. Nos. 11-13.) On August 21, 2018, the parties filed a Joint Stipulation ("Joint Stip."). (Dkt. No. 23.) Plaintiff seeks an order reversing the Commissioner's decision and ordering the payment of benefits or, in the alternative, remanding for further proceedings. (Joint Stip. at 31.) The Commissioner

---

[1] Partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

1    requests that the ALJ's decision be affirmed or, in the alternative, remanded for further
2    proceedings. (*See id.* at 31.) The Court has taken the matter under submission without oral
3    argument.

5                    **SUMMARY OF ADMINISTRATIVE PROCEEDINGS**

7            On June 6, 2013, Plaintiff, who was born on April 15, 1967, filed an application for a
8    period of disability and DIB.[2] (*See* Administrative Record ("AR") 343.) Plaintiff alleged
9    disability commencing December 31, 2011[3] due to a back injury. (AR 363.) Plaintiff
10   previously worked as a gardener (DOT 301.687-018). (AR 39, 364.) After the
11   Commissioner denied Plaintiff's application initially (AR 150), Plaintiff filed a written
12   request for a hearing on November 19, 2013 (AR 166). Administrative Law Michael J.
13   Kopicki ("ALJ") held a video hearing on February 18, 2015, a supplemental video hearing
14   on August 4, 2015, and a third video hearing on December 8, 2015. (AR 23, 68, 109, 120.)
15   Plaintiff, who was represented by counsel and assisted by a Spanish language translator,
16   testified before the ALJ as did two vocational experts ("VEs"), Ileana Chapman and Martin
17   Brodwin, and a medical expert ("ME") Ronald Gaylon, M.D., a board certified orthopedic
18   surgeon. (AR 68-149.) On April 7, 2016, the ALJ issued an unfavorable decision, denying
19   Plaintiff's application. (*Id.* 23-41.) On August 1, 2017, the Appeals Council denied
20   Plaintiff's request for review. (*Id.* 1-8.)

22                     **SUMMARY OF ADMINISTRATIVE DECISION**

24           The ALJ found that Plaintiff met the insured status requirements of the Social Security
25   Act through December 31, 2015. (AR 26.) The ALJ further found that Plaintiff had not

---

[2]      Plaintiff was 44 years old on the initial alleged onset date and thus met the agency's definition of a younger person. *See* 20 C.F.R. §§ 404.1563(e). Plaintiff changed age categories on April 15, 2017 when he turned 50 years old, which is defined as a person closely approaching advanced age. *Id.* § 404.1563(d).

[3]      Plaintiff later amended his alleged onset date to April 15, 2012. (*See* AR 26.)

2

engaged in substantial gainful activity since his amended alleged onset date of April 15, 2012 through his date last insured. (AR 26.) The ALJ determined that Plaintiff had the following severe impairments: "degenerative disc disease of the lumbar spine, diabetes mellitus, and major depressive disorder with psychotic features." (AR 26.) After specifically considering the criteria for listing 1.04 (spine disorder) and 12.04 (affective disorders), the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any impairments listed in 20 C.F.R. part 404, subpart P, appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). (AR 27-28.) The ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform "light work" as follows:

> [Plaintiff] is limited to lifting and/or carrying 20 pounds occasionally, 10 pounds frequently; standing and/or walking with normal breaks for a total of about six of eight hours; and sitting with normal breaks for about six of eight hours. He was limited to occasionally climbing ramps, stairs, ladders, ropes, and scaffolds, balancing, stooping, kneeling, crouching, and crawling. [Plaintiff] was further limited to understanding, remembering, and carrying out simple instructions, in work setting [sic] involving no more than occasional contact with the general public. Finally, [Plaintiff] has limited ability to speak, understand, and read English and very limited ability to write English.

(AR 29.)

The ALJ found that Plaintiff was unable to perform his past relevant work as a gardener but other jobs existed in significant numbers in the national economy that Plaintiff could have performed, including the representative occupations of Trimmer (DOT 732-

684.046),[4] Bench Assembler (DOT 706.684-042), and Product Sander (DOT 761.684-030). (AR 40.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from the alleged onset date through the date of the ALJ's decision. (AR 41.)

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether it is free from legal error and supported by substantial evidence in the record as a whole. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is 'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 522-23 (9th Cir. 2014) (internal citations omitted). "Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).

Although this Court cannot substitute its discretion for the Commissioner's, the Court nonetheless must review the record as a whole, "weighing both the evidence that supports and the evidence that detracts from the [Commissioner's] conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal quotation marks and citation omitted); *Desrosiers v. Sec'y of Health and Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). "The ALJ

---

[4]    The VE testified that Plaintiff could perform the occupation of "trimmer in the cloth industry, garments, paper industry, DOT number 732.684-046." (AR 141.) The ALJ relied on the VE's testimony in finding that Plaintiff could perform the requirements of the representative occupation of "trimmer" – light work, SVP 2 – with 39,500 jobs in the national economy. (AR 40.) The title cited by the VE, DOT 732.684-046, refers to the occupation of celluloid trimmer in the toy or sports equipment industry – not the occupation of "trimmer in the cloth industry, garments, paper industry" – but it is also defined as light work, SVP 2. Any error is harmless because the ALJ found that there are more than 140,000 jobs in the national economy in the other representative occupations that Plaintiff could perform. (*See* AR 40); *see also Hoffman v. Astrue*, No. C09-5252RJB-KLS, 2010 WL 1138340, at *15 (W.D. Wash. Feb. 8, 2010) (discussing what constitutes a "significant number" of jobs in the national economy and finding that 9,000 is a significant number of jobs in the national economy).

is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The Court will uphold the Commissioner's decision when the evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). However, the Court may review only the reasons stated by the ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely." *Orn*, 495 F.3d at 630; *see also Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). The Court will not reverse the Commissioner's decision if it is based on harmless error, which exists if the error is "'inconsequential to the ultimate nondisability determination,' or if despite the legal error, 'the agency's path may reasonably be discerned.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015) (internal citations omitted).

## DISCUSSION

The following issues are in dispute: (1) whether the Appeals Council erred in denying Plaintiff's request for review of the ALJ's decision following Plaintiff's submission of new evidence; (2) whether the ALJ improperly evaluated the opinions of the treating physicians and non-treating consultants; (3) whether the ALJ improperly evaluated the credibility of Plaintiff's statements about his symptoms and limitations; and (4) whether the ALJ included all of the relevant limitations in hypotheticals to the VE. (*See* Joint Stip. at 4.)

## I.    Appeals Council's Denial of Plaintiff's Request for Review

Plaintiff argues that the Appeals Council erred by denying Plaintiff's request for review of the ALJ's decision after Plaintiff submitted records from Huntington Hospital corresponding to a psychiatric hospitalization from April 26, 2015 to May 3, 2015. (Joint Stip. at 5, 9.) Defendant rightly observes that federal courts "do not have jurisdiction to

review a decision of the Appeals Council denying a request for review of an ALJ's decision." (Joint Stip. at 10) (citing *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1163 (9th Cir. 2012)). Nevertheless, both parties concede that the Court may review the record as a whole, including any new evidence provided to the Appeals Council, to determine whether the Commissioner's decision is supported by substantial evidence. (*See id.* at 5, 9, 10); *see also Brewes*, 682 F.3d at 1163. Here, Plaintiff appears to contend that, when the record is reviewed as a whole, the ALJ's decisions to discount the opinions of the consulting psychologist, Dr. Amber Ruddock, and Plaintiff's treating psychiatrist, Dr. Jaafar Zada, are not supported by substantial evidence in the record. (Joint Stip. at 6; *see also* Joint Stip. at 18 (describing "Issue No. 1" as including an argument that "the ALJ failed to properly credit Plaintiff's treating mental health providers").) As explained below, the Court agrees.

## A. Applicable Law

To reject an uncontradicted opinion of a treating or examining physician, the ALJ must provide "clear and convincing reasons that are supported by substantial evidence." *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017); *Ghanim v. Colvin*, 763 F.3d 1154, 1160-61 (9th Cir. 2014). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Trevizo*, 871 F.3d at 675. Further, the ALJ may not arbitrarily substitute his own judgment for competent medical opinion, make his own independent medical findings, or assess an RFC that is not supported by the medical evidence. *Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006); *see also Burgess v. Astrue*, 537 F.3d 117, 131 (2d Cir. 2008) ("Neither a reviewing judge nor the Commissioner is permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion, or indeed for any competent medical opinion.") (internal quotation marks and citations omitted); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (as a lay

person, an ALJ is "not at liberty to ignore medical evidence or substitute his own views for uncontroverted medical opinion"; he is "simply not qualified to interpret raw medical data in functional terms").

## B. New Evidence Submitted to Appeals Council

The evidence submitted by Plaintiff to the Appeals Council reflects that, on April 26, 2015, Plaintiff was admitted to Huntington Hospital on a 72-hour hold status pursuant to California Welfare and Institutions Code § 5150. (AR 47, 57.) The ALJ, who did not have the Huntington Hospital records before him at the hearings, stated that he wanted to review these records because they "could be quite probative." (AR 107.)

According to the records Plaintiff subsequently provided to the Appeals Council, Plaintiff told the Huntington Hospital staff that he was hearing voices telling him to fight with people. (AR 47.) Additionally, "[Plaintiff] was quite agitated in the emergency room. He jumped off the gurney with his fists clenched, picked up a cane, and lunged at his wife. Security had to intervene." (AR 47.) Plaintiff was given a sedative, Ativan, for his agitation. (AR 56.) Plaintiff reported having hallucinations for many years and stated that he had a history of previous psychiatric hospitalizations. (AR 47.) Plaintiff stated that he was taking 100 mg of Seroquel, an antipsychotic medication, daily, and his wife confirmed that Plaintiff used to take 300 mg of Seroquel daily but it had been reduced to 200 mg and then 100 mg because of daytime sedation. (AR 47.)

On April 27, 2015, Viguen Movsesian, M.D., a psychiatrist, conducted a mental status examination and observed that Plaintiff appeared to be responding to internal stimuli and had "frequent thought blocking . . . questions have to be asked repeatedly to elicit a response." (AR 47-48.) Dr. Movsesian observed "some paranoia evident." (AR 48.) Dr. Movsesian

7

diagnosed Plaintiff with schizophrenia, paranoid type, and assessed a GAF score of 20,[5] indicating severe symptoms that may include some danger to self or others. (AR 48.) He prescribed a different antipsychotic medication, Zyprexa, 15 mg, to control Plaintiff's psychotic symptoms. (AR 48.)

The May 3, 2015 discharge summary states that Plaintiff was prescribed Zyprexa and Depakote was added, 1000 mg nightly, to control Plaintiff's mood fluctuations. (AR 53.) Upon discharge, Plaintiff was calm, cooperative, and friendly. (AR 53.) Dr. Movsesian assessed a GAF score of 60 (AR 53), indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning.

### C. Opinions of Dr. Ruddock and Dr. Zada

#### 1. Dr. Ruddock

Amber Ruddock, Ph.D., a clinical psychologist, examined Plaintiff at the request of the Commissioner on July 30, 2015. (AR 651-55.) Under "Records Reviewed," Dr. Ruddock wrote that she reviewed the records Plaintiff brought reflecting a May 3, 2015 discharge summary following a psychiatric hospitalization at Huntington Hospital. (AR 651.) Plaintiff reported being under the care of a psychiatrist since 2006, having a history of psychiatric hospitalization, and experiencing suicidal thoughts, feelings of depression, anxiety, and social isolation. (AR 652.) Plaintiff reported experiencing auditory and visual hallucinations at times when his depression is at its worst – namely, voices talking to him

---

[5]     A GAF score of 11 to 20 indicates severe symptoms including "some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) or occasionally fails to maintain minimal personal hygiene (e.g., smears feces) or gross impairment in communication (e.g., largely incoherent or mute)."  *See* Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 34 (revised 4th ed. 2000). The Commissioner has stated that the GAF scale "does not have a direct correlation to the severity requirements in [the] mental disorders listings," 65 Fed. Reg. 50764, 50764-65 (Aug. 21, 2000), and the most recent edition of the DSM "dropped" the GAF scale.  Diagnostic And Statistical Manual Of Mental Disorders 16 (5th ed. 2012).

and visions of cars driving at him.  (AR 652, 653.)  Plaintiff denied needing any assistance with any activities of daily living.  (AR 653.)

On the mental status examination, Dr. Ruddock observed that Plaintiff's memory was intact, his attention and concentration span were appropriate, and his insight and judgment were average.   (AR 653.)   Because Plaintiff does not speak English, Dr. Ruddock administered a nonverbal assessment of Plaintiff's IQ in lieu of the Wechsler Adult Intelligence Scale.  (*See* AR 26, 654.)  Based on that test, Dr. Ruddock assessed a full scale IQ score of 75, placing Plaintiff in the fifth percentile, and she opined that the test results appeared to be a generally valid estimate of Plaintiff's functional level.  (AR 654.)  Based on the test results and clinical data, Dr. Ruddock diagnosed Plaintiff with major depressive disorder, severe with psychotic features, and borderline intellectual functioning.  (AR 654.) She assessed a GAF score of 52, indicating moderate symptoms or moderate difficulty in social, occupational, or school functioning.  Dr. Ruddock made the following assessment of Plaintiff's abilities and limitations:

> [Plaintiff] would be able to understand, remember and carry out short, simplistic instructions with moderate difficulty.  He also would have marked difficulty to understand, remember and carry out detailed and complex instructions.  He would have moderate difficulty to make simplistic work-related decisions without special supervision.  He would have moderate difficulty to comply with job rules such as safety and attendance.  He would have marked difficulty to respond to change in a normal workplace setting.  He would have marked difficulty to maintain persistence and pace in a normal workplace setting . . . .  [Plaintiff] presents with moderate difficulty to interact appropriately with supervisors, coworkers and peers on a consistent basis.

(AR 654-55.)

### 2. *Opinion of Dr. Zada*

On September 21, 2006, Plaintiff began receiving psychiatric treatment with Pacific Clinics. (*See* AR 523.) His treatment consisted of psychotherapy, primarily with Lizett Gaona, MSW, and medication support services from psychiatrist Jaafar Zada, M.D. (*See e.g.,* AR 524-32.) The record contains more than 60 pages of treatment records reflecting Plaintiff's appointments with both Dr. Zada and Ms. Gaona between 2011 and 2015. (*See* AR 534-99.)

On February 24, 2015, Dr. Zada completed an Assessment of Mental Impairment on a form provided by Plaintiff's lawyer. (AR 608-14.) On that form, Dr. Zada indicated that his facility had treated Plaintiff on a monthly basis since October 2006. (AR 608.) He listed Plaintiff's diagnoses as depression, manic syndrome, and bipolar syndrome. (AR 609.) He described Plaintiff's symptoms as including: racing thoughts; flight of ideas; irritability; mood swings; poor memory and concentration; distractibility; sadness; depression; and poor sleep. (AR 609.) He stated that Plaintiff had experienced "multiple decompensations" in the last two years when Plaintiff became "hypomanic and delusional." (AR 610.) Dr. Zada indicated that Plaintiff was markedly limited in his ability to do the following: understand and remember very short and simple instructions; understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with, or proximity to, others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 610-14.) Dr. Zada further opined that Plaintiff was moderately limited in his ability to: carry out

short and very simple instructions; make simple work-related decisions; respond appropriately to changes in the work setting; and travel in unfamiliar places or use public transportation. (AR 613.) Dr. Zada stated that Plaintiff's prescriptions were Seroquel, 100 mg, and Lexapro, 10 mg, and that Plaintiff experienced drowsiness and weight gain as medication side effects. (AR 614.)

### D. Analysis of ALJ's Assessment of the Opinions of Drs. Ruddock and Zada

#### 1. *At Step Two of the Sequential Analysis*

##### a. *Applicable Law*

At step two of the sequential analysis, the ALJ must determine whether the claimant has a medically determinable impairment, or combination of impairments, that is "severe." The Commissioner defines a severe impairment as "[a]n impairment or combination of impairments . . . [that] significantly limit[s] your physical or mental ability to do basic work activities," including, *inter alia*: "understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting." 20 C.F.R. § 404.1521. "An impairment or combination of impairments may be found not severe *only if* the evidence establishes a *slight* abnormality that has no more than a *minimal* effect on an individual's ability to work." *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (emphasis added) (citations and internal quotation marks omitted). If "an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's ability to do basic work activities, the sequential evaluation should not end with the not severe evaluation step." *Id.* at 687 (citation and internal quotation marks omitted). "Step two, then, is a *de minimis* screening device [used] to dispose of groundless claims, and an ALJ may find that a claimant lacks a medically severe impairment or

11

combination of impairments only when his conclusion is clearly established by medical evidence." *Id.* (emphasis added) (citations and internal quotation marks omitted).

### b. ALJ Rejected Portions of Dr. Ruddock's Opinion at Step Two

At step two, the ALJ rejected Dr. Ruddock's assessment of a full scale IQ score of 75 and declined to adopt her diagnosis of borderline intellectual functioning as a discrete severe medically determinable impairment. (AR 26-27.) The ALJ presented the following rationale for his decision:

> Although [Plaintiff's IQ] test[] scores were low, there is no other longitudinal record of difficulty with his intellectual functioning, including evidence of deficits in adaptive functioning, so I do not adopt borderline intellectual functioning as a discrete severe impairment. In addition, while coded in the [DSM-V], it does not appear as [a] condition listed under Intellectual Disabilities; and per the preamble to mental listing in Appendix 1, Subpart 4, the IQ scores listing in 12.05 reflect values from the Wechsler series, so the significance of the IQ score obtained on that day is not entirely clear.

(AR 26-27.) Nevertheless, the ALJ stated that he considered Plaintiff's IQ scores in his assessment of Plaintiff's mental limitations. (AR 27.)

### c. Analysis

The ALJ's reasons for declining to recognize Dr. Ruddock's diagnosis of borderline intellectual functioning as a severe impairment at step two of the sequential analysis are not specific, legitimate, and supported by substantial evidence. *See Trevizo*, 871 F.3d at 675. First, the ALJ failed to perform the very analysis required in order to find that an impairment

is non-severe at step two – that is, he made no assessment of whether Plaintiff's borderline intellectual functioning had, or did not have, a more than a minimal effect on Plaintiff's ability to work. *See Webb*, 433 F.3d at 686.

Second, the ALJ found that there was no "longitudinal record of difficulty with [Plaintiff's] intellectual functioning, including evidence of deficits in adaptive functioning." (AR 26-27.) However, this finding is not supported by substantial evidence in the record. To the contrary, the record shows that, during the relevant period, deficits in Plaintiff's intellectual functioning caused Plaintiff to consistently struggle to understand and complete basic forms independently. (*See*, *e.g.*, AR 559, 560, 563, 566 (Plaintiff needs help understanding letters and completing forms regarding citizenship), AR 582 (Plaintiff needs help understanding and completing a form from the Department of Motor Vehicles), AR 596 (Plaintiff needs help completing Medical application).) The record similarly indicates that Plaintiff received a medical waiver from a psychiatrist on the civics portion of the naturalization test. (AR 79, 80.)

The record also contradicts the ALJ's determination that there was no evidence of deficits in adaptive functioning. Plaintiff indicated on his Function Report that he handles changes in routine "not so well" (AR 399), suggesting some difficulties with adaptive functioning. Drs. Ruddock and Zada also both assessed limitations in Plaintiff's ability to respond to change – Dr. Ruddock opined that Plaintiff would have "marked difficulty" responding to change in a normal workplace setting (AR 654) and Dr. Zada, who had the most longitudinal perspective on Plaintiff's mental health, opined that Plaintiff was "moderately limited" in his ability to respond to changes in the work setting (AR 613). The ALJ seemingly ignored these opinions in finding no evidence of deficits in adaptive functioning. *Cf. Garrison*, 759 F.3d at 1012-13 (ALJ errs when he ignores a medical opinion); *see also Marsh v. Colvin*, 792 F.3d 1170, 1172-73 (9th Cir. 2015) ("ALJ cannot in its decision totally ignore a treating doctor").

Finally, the ALJ declined to accept the validity of the Full Scale IQ score assessed by Dr. Ruddock because it was obtained via a different IQ test than the one discussed in the preamble to mental listing in Appendix 1, Subpart 4. According to that preamble, IQ scores for Listing 12.05 (intellectual disability) reflect values from tests that have a mean of 100 and a standard deviation of 15, which includes the Wechsler series. "IQs obtained from standardized tests that deviate from a mean of 100 and a standard deviation of 15 require conversion to a percentile rank so that we can determine the actual degree of limitation reflected by the IQ scores." Title 20, Part 404, Subpart P, Appendix 1 at 513 (2015). However, Dr. Ruddock provided this conversion – noting that Plaintiff's Full Scale IQ Score of 75 on the CTONI-II test placed him in the 5th percentile. (AR 654.) Additionally, the preamble cited by the ALJ expressly provides for the use of the Tests of Nonverbal Intelligence (the "TONI" tests), like the one administered by Dr. Ruddock, for claimants who, like Plaintiff, "are not principally English-speaking." Title 20, Part 404, Subpart P, Appendix 1 at 513 (2015). Finally, the ALJ provided no other reason for questioning the validity of Plaintiff's IQ scores on the CTONI-II test, which Dr. Ruddock stated "appear to be a generally valid estimate of [Plaintiff's] functional level at this time." (AR 654.)

In sum, at step two of the sequential analysis, the ALJ failed to adequately assess whether Plaintiff's borderline intellectual functioning constituted a "severe" impairment and failed to provide specific and legitimate reasons supported by substantial evidence in the record for discounting the relevant opinions of Drs. Ruddock and Zada. Accordingly, on remand, the ALJ must either find that this diagnosis constitutes a severe impairment at step two or provide specific and legitimate reasons supported by substantial evidence in the record for discounting the relevant opinions and diagnoses of Drs. Ruddock and Zada.

\\
\\
\\
\\

### 2.  At Step Three of the Sequential Analysis

At step three of the sequential evaluation process, the ALJ must determine whether the claimant has an impairment or combination of impairments that meets or equals an impairment listed in the Appendix to federal regulations.[6]   20 C.F.R. § 404.1520(d). Conditions set forth in the Listing of Impairments ("Listings") are considered so severe that "they are irrebuttably presumed disabling, without any specific finding as to the claimant's ability to perform his past relevant work or any other jobs."  *Lester v. Chater*, 81 F.3d 821, 828 (9th Cir. 1995); *see also* 20 C.F.R. §§ 404.1525, 416.925-416.926.  The claimant bears the burden of establishing a prima facie case of disability under the Listings.  *See Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002).

The ALJ found that Plaintiff's impairments did not meet or equal the criteria for a listed impairment.  Specifically, the ALJ found that Plaintiff did not satisfy the criteria for Listing 12.04 concerning affective disorders[7] because, although Plaintiff satisfied part A of Listing 12.04 – that is, he had a medically documented persistence of depressive, manic, or bipolar syndrome characterized by the requisite symptoms – Plaintiff did not satisfy part B, which required Plaintiff to experience two of the following limitations:   (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.[8]  (*See* AR 27); *see also* 20

---

[6]      The Appendix can be found at 20 C.F.R., Pt 404, Subpt. P, App. 1.

[7]      Listing 12.04 is now described as the listing for "depressive, bipolar and related disorders" rather than affective disorders.  *Compare* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,138, 66,167 (Sept. 26, 2016) *with* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury; Final Rules, 65 Fed. Reg. 50,746, 50,780 (Aug. 21, 2000).

[8]      In September 2016, several months after the ALJ's decision, the Commissioner revised Listing 12.04 and the revisions became effective on January 17, 2017 – before the Appeals Council denied review of the ALJ's decision.  *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,138, 66,167 (Sept. 26, 2016); *see also id.* 81 Fed. Reg. 66,138 n.1 ("[W]e will use these final rules on and after their effective date, in any case in which we make a determining or decision.).  Notably, the Commissioner revised the criteria for listing 12.04 part B, which can now be satisfied if the plaintiff has marked limitations in any two of the following areas of mental functioning:  (1) understand,

C.F.R. Pt. 404 Subpt. P, App. 1 (2016).  As explained below, the ALJ failed to provide legally sufficient reasons supported by substantial evidence in the record for discounting the opinions of Drs. Ruddock and Zada concerning Plaintiff's limitations in those areas.

### a.  Marked Difficulties in Maintaining Persistence or Pace

In reaching the conclusion that Plaintiff did not satisfy Part B of Listing 12.04, the ALJ rejected portions of both Dr. Ruddock and Dr. Zada's opinions.  Specifically, both Dr. Zada and Dr. Ruddock opined that Plaintiff would have marked difficulty maintaining persistence and a consistent pace:  Dr. Zada opined that Plaintiff was markedly limited in his ability to maintain attention and concentration for extended periods and perform at a consistent pace without an unreasonable number and length of rest periods; and Dr. Ruddock opined that Plaintiff would have marked difficulty maintaining persistence and pace in a normal workplace setting.  The ALJ, however, made no mention of either doctor's assessment of "marked" limitations in this area.  Instead, the ALJ found that Plaintiff had no more than moderate difficulties in concentration, persistence, or pace, because:  (1) Plaintiff had stated that he could follow written and spoken instructions well when they are in Spanish; (2) Dr. Ruddock found that Plaintiff's mental status examination revealed "appropriate" attention and concentration; and (3) Plaintiff was able to pass his citizenship test "though he was reportedly given help."  (AR 28.)  The ALJ's reasons for discounting the shared opinion of Drs. Zada and Ruddock are not clear, convincing, and supported by

---

remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; or (4) adapt or manage oneself.  Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,138, 66,167 (Sept. 26, 2016).  The Appeals Council stated that it "applied the laws, regulations, and rulings in effect as of the date we took this action," which presumably included the revised criteria for Listing 12.04 part B.  (AR 1.)  However, the Commissioner provided no written rationale for her determination not to credit Dr. Ruddock's opinion that Plaintiff would have marked difficulty in two of the Listing 12.04 part B criteria:  maintaining persistence and pace in a normal workplace setting and adapting to change in a normal workplace setting.  (AR 654.)  On remand, the ALJ would be required to apply the revised Listing 12.04 part B criteria.  See 81 Fed. Reg. 66,138 n.1 ("If a court reverses our final decision and remands a case for further administrative proceedings after the effective date of these final rules, we will apply these final rules to the entire period at issue in the decision we make after the court's remand.").

substantial evidence – as required to support the ALJ's decision to discount it.  *See Trevizo*, 871 F.3d at 675.

i.    Plaintiff's Ability to Follow Instructions

With respect to the ALJ's determination that Plaintiff experienced only moderate difficulties in concentration, persistence, or pace because Plaintiff could following written and spoken instructions when they are in Spanish, Plaintiff's notes from his therapist demonstrate that, even with the assistance of his therapist and his wife, Plaintiff experienced great difficulty with written instructions – even when those instructions were available in Spanish.  Specifically, on September 20, 2013, Plaintiff "reach[ed] out" to his therapist "for assistance in filling out Immigration/Citizenship forms" (AR 563), which are available in Spanish.  Plaintiff's therapist "read forms" to Plaintiff and "aided" Plaintiff in filling out the forms "due to [Plaintiff's] inability to concentrate and delusions."  (AR 563.)  His therapist then "provided [Plaintiff] with a[n] outline of how to submit forms and repeated steps to [Plaintiff]."  (AR 563.)  Finally, his therapist "prompted [Plaintiff] to reiterate the steps and provided encouragement and praise for his ability to remember how to follow through with submission of necessary paperwork."  (AR 563.)

The following month, Plaintiff arrived at this appointment with a letter from USCIS, which his therapist invited Plaintiff to open and "read [] along with" his therapist.  (AR 560.) Plaintiff's therapist "modeled highlighting important parts of the letter and making notes on the margins."  (AR 560.)  Plaintiff's therapist "prompted [Plaintiff] to identify . . . what he needs to do to resolve the problem/requests of each letter.  [Therapist] offered feedback and invited [Plaintiff] to reflect on what he thin[k]s are the next steps."  (AR 560.)  During the course of the session, Plaintiff reported "anxiety" and "fear" "at having received multiple letters from government agency and not knowing what is requested of him" and also reported "feeling unable to concentrate and focus."  (AR 560.)

17

Plaintiff brought a second letter from USCIS to his November 20, 2013 appointment. (*See* AR 559.) Again, "[Plaintiff's therapist] read [the] letter with [Plaintiff] and highlighted necessary required information." (AR 559.) Plaintiff's therapist then called the "courthouse" and the Duarte Police Department and "role modeled" for Plaintiff the act of asking for necessary documentation. (AR 559.) Plaintiff's therapist also "noted hours of operation for these offices and [Plaintiff] agreed to walk in and ask for necessary documents with the aid of notes that [therapist] provided." (AR 559.)

The record also shows that Plaintiff required his therapist's assistance to complete a form from the Department of Motor Vehicles (AR 582), which makes its forms available in Spanish, and required his wife's help to complete and submit his Medical application, which Plaintiff found confusing, frustrating, and overwhelming (*see* AR 596) despite its availability in Spanish. In light of the foregoing, substantial evidence in the record shows that, regardless of Plaintiff's self-assessment of his ability to follow written and spoken instructions, Plaintiff had difficulty following written instructions because of his mental impairments – not because of language difficulties.

ii.    Plaintiff's Mental Status Examination with Dr. Ruddock

The ALJ's second reason for assessing only moderate difficulties in Plaintiff's ability to perform at a consistent pace was that Plaintiff's mental status examination with Dr. Ruddock revealed "appropriate" attention and concentration. However, as pointed out above, *both* Dr. Ruddock and Dr. Zada opined that Plaintiff would have marked difficulty performing at a consistent pace and there are no contradictory medical opinions in the record. The observation of one of those physicians regarding Plaintiff's "attention" during a one-time mental status examination is not a convincing reason for discounting the shared medical opinion of the only two mental health practitioners to consider the issue, including the opinion of the psychologist who interpreted the results of the very mental status

18

examination cited by the ALJ. *See also Miller v. Astrue*, 695 F. Supp. 2d 1042, 1048 (C.D. Cal. 2010) (it is improper for ALJ to substitute his own opinion for a doctor's professional interpretation of the clinical testing); *see also Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (as a lay person, an ALJ is "not at liberty to ignore medical evidence or substitute his own views for uncontroverted medical opinion"; he is "simply not qualified to interpret raw medical data in functional terms."); *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("'[T]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion[.]'" (citations omitted)).

### iii. Plaintiff's Citizenship Test

The ALJ's third reason for assessing Plaintiff with only moderate difficulties in his ability to perform at a consistent pace was that Plaintiff was able to pass his citizenship test "though he was reportedly given help." (AR 28.) However, Plaintiff testified that he was asked approximately ten questions on the naturalization test (AR 79), having received a medical waiver for both the English and civics portion of the test from a psychiatrist (AR 80). Accordingly, Plaintiff's ability to answer approximately 10 questions about his own application and background is not a convincing reason supported by substantial evidence for discounting the medical professionals' shared opinion that Plaintiff is markedly limited in his ability to perform at a consistent pace.

In sum, the ALJ failed to provide clear and convincing reasons for discounting the shared opinion of Drs. Zada and Ruddock that Plaintiff would have a marked difficulty performing at a consistent pace.

\\
\\
\\
\\

1

*b. Marked Difficulties in Social Functioning*

2

3    The ALJ also assessed only moderate difficulties in social functioning at step three of

4  the sequential analysis, thereby discounting Dr. Zada's opinion that Plaintiff would have

5  would have marked difficulty working in coordination with, or proximity to, others and

6  getting along with coworkers or peers.  The ALJ explained that he assessed only moderate

7  difficulties in social functioning because Plaintiff:  reported going to church once a week;

8  stated in his Function Report that he does not have problems getting along with others; had

9  normal mental status examinations; cooperated with his caseworker to obtain U.S.

10  citizenship; and was able to bring his incidents of increased irritability under control with

11  medication.  (AR 28.)

12

13    i.    ALJ's Reasoning is Internally Inconsistent

14

15    The ALJ's reasoning is internally inconsistent because, when determining Plaintiff's

16  residual functional capacity, the ALJ determined that Plaintiff was limited to only

17  "occasional contact with the general public."  (AR 29.)  A limitation to only occasional

18  interaction with the general public reflects a claimant's "marked to extreme" limitation in

19  social functioning.  *See Knight v. Colvin*, No. CV 15-0882 KBM, 2016 WL 9489144, at *6

20  (D.N.M. Dec. 5, 2016) (citing *Chapo v. Astrue*, 682 F.3d 1285, 1290 (10th Cir. 2012)); *see*

21  *also Norris v. Colvin*, 160 F. Supp. 3d 1251, 1284 (E.D. Wash. 2016) (finding that an

22  individual with a "marked" limitation in his ability to interact with others was "frequently"

23  unable to interact with others); *Hoyle v. Colvin*, No. CIV.A. 0:13-3310-RMG, 2014 WL

24  7369428, at *9 (D.S.C. Dec. 29, 2014) (limiting a claimant to performing an activity

25  occasionally is a proper and appropriate interpretation of a "marked" limitation in the

26  claimant's ability to perform that activity); *but see Sandoval v. Berryhill*, No. CIV 17-0641

27  JHR, 2018 WL 3429920, at *7 (D.N.M. July 16, 2018) (the term "occasionally" in an RFC

28  adequately reflects a "moderate to marked" limitation).  Accordingly, the ALJ's failure to

20

adopt Dr. Zada's assessment of a "marked" limitation in areas of social functioning at step three of the sequential analysis – but to adopt it when formulating the RFC – reflects an error by the ALJ.

ii.    ALJ's Findings are not Supported by Substantial Evidence

Additionally, the ALJ's determination at step three that Plaintiff experienced only moderate difficulties in social functioning the record is at odds with substantial evidence in the record, which is rife with incidents in which members of Plaintiff's family contacted Pacific Clinics or another health care provider out of concern about Plaintiff's behavior towards others.  On September 9, 2011, Plaintiff's daughter called Plaintiff's case manager and expressed concern that Plaintiff might become violent.  (AR 601.)  On October 4, 2011, Plaintiff's wife reported to Plaintiff's case manager that she had called the police the week prior due to an argument with Plaintiff, and Plaintiff's case manager discussed a safety plan to ensure that Plaintiff's wife would be protected "due to [Plaintiff] having a history of being violent."  (AR 597.)  On May 21, 2013, Plaintiff's wife contacted Plaintiff's case manager because Plaintiff had been "agitated, irritable, and yelling in the middle of the street."  (AR 580.)  On May 29, 2013, Plaintiff's case manager reported that Plaintiff's wife had called in for assistance because Plaintiff was "almost" arrested.  (AR 579.)  A May 30, 2013 note from Plaintiff's therapist states "[Plaintiff's] interpersonal relationships have been increasingly conflictual and family is in need of support."  (AR 577.)  On June 12, 2013, Plaintiff reported that his wife had taken his car keys because "she felt that he is too symptomatic to independently drive a vehicle throughout the community."  (AR 571.)  On June 17, 2013, Plaintiff's wife reported that Plaintiff was engaging in "odd and inappropriate behaviors" and had been "aggressive, angry, verbally abusive."  (AR 573.)  She stated that she was concerned Plaintiff was "going to do something and get arrested."  (AR 573.)  Finally, on April 26, 2015, Plaintiff was admitted to Huntington Hospital on a 72-hour hold status after  Plaintiff told hospital staff that he was hearing voices telling him to fight with

21

people, was "quite agitated in the emergency room," and "jumped off the gurney with his fists clenched, picked up a cane, and lunged at his wife." (AR 47.)

Against this backdrop, the ALJ's reasons for discounting Dr. Zada's assessment of a marked limitation in some areas of social functioning are not legitimate and supported by substantial evidence in the record. In particular, the ALJ had cited Plaintiff's reports that he gets along well with others (AR 398), despite the fact that Plaintiff also conceded that he does not spend time with others and does not do anything with others (AR 397) except, perhaps, "chat" (AR 136-37). Against Plaintiff's history of erratic, hostile, and inappropriate behavior, Plaintiff's limited relationships with others is not a legitimate reason supported by substantial evidence for discounting Dr. Zada's assessment of a marked limitation in some areas of social functioning.

The ALJ also cited Plaintiff's ability to attend religious services as a reason for discounting Dr. Zada's opinion that Plaintiff would have would have marked difficulty working in coordination with, or proximity to, others and getting along with coworkers or peers. However, Plaintiff's ability to attend a one-hour church service once a week (*see* AR 137, 138) is not a legitimate reason supported by substantial evidence for discounting Dr. Zada's assessment of a marked limitation on Plaintiff's ability to work forty hours a week in coordination with, or in proximity to, others and get along with coworkers or peers.

The ALJ also cited Plaintiff's "normal" mental status examinations in support of his determination that Plaintiff has only moderate difficulties in social functioning. The ALJ's characterization of Plaintiff's mental status examinations as "normal" is not supported by substantial evidence because Plaintiff often did not receive a "normal" mental status examination. To the contrary, Dr. Zada frequently observed that Plaintiff's mood was sad or depressed (AR 552 (3/4/14), 550 (4/15/14), 538 (11/18/14), 533 (12/16/14)), his affect "flat," "blunted," or "constricted" (AR 595 (10/3/11), 552 (3/4/14), 550 (4/15/14), 548 (5/27/14),

542 (9/8/14), 540 (9/23/14), 538 (11/18/14), 533 (12/16/14), and/or his thought process "circumstantial" (*see, e.g.*, AR 552 (3/4/14), 550 (4/15/14), 548 (5/27/14), 538 (11/18/14)). Further, on some instances, Dr. Zada assessed a "normal" mental status examination but his treatment notes observed other severe irregularities, such as a "manic" presentation and "racing thoughts," that could interfere with Plaintiff's social functioning. (*E.g.*, AR 574 (6/11/13 – manic presentation), 575 (6/4/13 – manic presentation), 578 (5/28/13 – manic presentation), 581 (5/21/13 – manic presentation, racing thoughts).) Finally, Plaintiff frequently presented as irritable, or reported experiencing irritability, to Dr. Zada (*see, e.g.*, AR 585 (9/24/12 – "quite argumentative"), 581 (5/21/13 – irritable), 578 (5/28/13 – irritable), 575 (6/4/13 – irritable), 574 (6/11/13 – irritable), 550 (4/15/14 - irritable), 532-33 (12/16/14)), and Plaintiff frequently received talk therapy related to irritability, anger, and self-isolation (*see, e.g.*, AR 596 (9/27/11 – therapist attempted to de-escalate Plaintiff's anger regarding marital difficulties), 572 (6/12/13 – Plaintiff presented as irritable and unstable, angry and then pleasant from one conversation to the next), 571 (6/12/13 – Plaintiff is frustrated with his wife), 567 (7/22/13 – collateral session with Plaintiff and his wife addressing Plaintiff's irritability), 566 (8/20/13 – Plaintiff is irritable, having difficulty maintaining social relationships, and self-isolating), 544 (7/14/14 – Plaintiff reports irritability, mood swings, isolating, arguments with family members), 536 (12/8/14 – Plaintiff reports feeling frustrated and anger, isolating, lashing out at family members), 534 (12/15/14 – Plaintiff and therapist discuss "anger and utility in anger in [Plaintiff's] life and how it affects his relationships," and therapist reports that Plaintiff is impaired in his ability to foster healthy interpersonal relationships with family).)

The ALJ also found that Plaintiff had only moderate difficulties in social functioning because Plaintiff's incidents of increased irritability were adequately controlled with medication. Again, substantial evidence does not support the ALJ's finding. To the contrary, the record shows that although Plaintiff was consistently prescribed medication, it was unable to prevent Plaintiff's incidents of increased anger, irritability, and/or mania from

recurring. (*See generally* AR 601 (9/9/11 – Plaintiff's daughter expressed concern that Plaintiff might become violent), 596 (9/27/11 – therapist attempted to de-escalate Plaintiff's anger regarding marital difficulties), 597 (10/4/11 – Plaintiff's wife reports that he called the police due to an argument with Plaintiff, therapist and Plaintiff's wife develop a safety plan), 585 (9/24/12 – "quite argumentative"), 584 (10/22/12 – "quite argumentative"), 580 (5/21/13 – Plaintiff's wife reports that Plaintiff had been "agitated, irritable, and yelling in the middle of the street"), 579 (5/29/13 – Plaintiff's wife reports that Plaintiff had almost been arrested), 577 (5/30/13 – Plaintiff's interpersonal relationships are increasingly conflictual and family is in need of support), 573 (6/17/13 – Plaintiff's wife reports that Plaintiff had been "aggressive, angry, verbally abusive"), 574 (6/11/13 – manic presentation), 572 (6/12/13 – Plaintiff presented as irritable and unstable, angry and then pleasant from one conversation to the next), 567 (7/22/13 – collateral therapy session with Plaintiff and his wife addressing Plaintiff's irritability), 566 (8/20/13 – Plaintiff is irritable, having difficulty maintaining social relationships, and self-isolating), 581 (5/21/13 – irritable, manic presentation, racing thoughts), 578 (5/28/13 – irritable, manic presentation), 575 (6/4/13 – irritable, manic presentation), 574 (6/11/13 – irritable), 550 (4/15/14 - irritable), 544 (7/14/14 – Plaintiff reports irritability, mood swings, isolating, arguments with family members), 536 (12/8/14 – Plaintiff reports feeling frustrated and anger, isolating, lashing out at family members), 532-33 (12/16/14 – irritable), 534 (12/15/14 – Plaintiff and therapist discuss "anger and utility in anger in [Plaintiff's] life and how it affects his relationships," and therapist reports that Plaintiff is impaired in his ability to foster healthy interpersonal relationships with family), 47 (4/26/15 – Plaintiff admitted to Huntington Hospital for a psychiatric hold, told staff he was hearing voices telling him to fight with people, became agitated in emergency room and lunged at his wife).) There is also some evidence in the record that Plaintiff's mental illness interfered with his ability to fully and routinely comply with his medication regime. (*See, e.g.*, AR 585 (9/24/12 – Plaintiff reports that he is not following doctor's instructions and is only taking half of his medication dosage), 584 (10/22/12 – same), 573 (6/12/13 - wife is having difficult time getting Plaintiff to take his medication).)

24

Finally, the ALJ cited Plaintiff's ability to cooperate with his therapist in connection with his application for U.S. citizenship as a reason for discounting Dr. Zada's assessment of marked difficulties working in coordination with, or proximity to, others and getting along with coworkers or peers. The Court is not persuaded that Plaintiff's ability to cooperate with a trained mental health practitioner – one whom Plaintiff had seen for years for talk therapy – in the context of a few therapy sessions is a legitimate reason supported by substantial evidence for discounting Dr. Zada's opinion regarding Plaintiff's social functioning. To the contrary, one would assume that Plaintiff would not need the assistance of his longtime therapist to complete paperwork and obtain relevant records if did not have a marked impairments in his ability to get along and coordinate with others. Further, the record shows that Plaintiff was unable to make even basic phone calls on his own behalf and was given "notes" from his therapist for how to obtain necessary documents in person from the courthouse and police department. (*See* AR 559 (11/20/13 - Plaintiff's therapist "called courthouse and Duarte Police Dept with [Plaintiff] in the room and role modeled asking for necessary documentation. [Therapist] noted hours of operation for these offices and [Plaintiff] agreed to walk in and ask for necessary documents with the aid of notes that [therapist] provided.").)

In sum, the ALJ failed to provide a single legitimate reason supported by substantial evidence in the record for discounting Dr. Zada's assessment that Plaintiff would have marked difficulty working in coordination with, or proximity to, others and getting along with coworkers or peers. Accordingly, on remand, the ALJ will need to revisit his assessment of whether Plaintiff satisfies Listing 12.04 and, if he finds that Plaintiff does not, articulate legally sufficient reasons supported by substantial evidence for discounting the relevant opinions from Drs. Zada and Ruddock.

\\

\\

\\

### 3. In Determining Plaintiff's Residual Functional Capacity

As at steps two and three in the sequential analysis, the ALJ rejected significant portions of Dr. Ruddock and Dr. Zada's opinions in determining Plaintiff's residual functional capacity. Specifically, the ALJ discounted Dr. Ruddock and Dr. Zada's opinions regarding: Plaintiff's limitations in working with others;[9] Plaintiff's ability to understand, remember, and carry out simple instructions;[10] Plaintiff's ability to maintain concentration, persistence, and pace;[11] Plaintiff's ability to respond to change in a work setting;[12] and Plaintiff's ability to comply with job rules.[13] Because many of the reasons that the ALJ cited for discounting these portions of Dr. Ruddock and Dr. Zada's opinions are reasons that the Court has already analyzed at length *supra*, and because the Court has determined that remand is warranted, the Court exercises its discretion not to consider whether the ALJ's

---

[9]      Dr. Ruddock opined that Plaintiff has "moderate difficulty" interacting appropriately with supervisors, coworkers and peers, and Dr. Zada opined that Plaintiff would have marked difficulty working in coordination with, or proximity to, others, responding appropriately to criticism from supervisors, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes. The ALJ noted that: Plaintiff stated in his Function Report that he could get along well with others; notes during other examinations have stated that he was cooperative and pleasant; Plaintiff was pleasant and engaged well at each hearing; Plaintiff collaborated well with his case workers who helped him get U.S. citizenship; and Plaintiff's treatment notes from PC indicate that he was cooperative. (AR 36.)

[10]      Dr. Zada opined that Plaintiff was "markedly limited" in his ability to understand and remember simple instructions and "moderately limited" in his ability to carry out simple instructions, while Dr. Ruddock opined that Plaintiff would have "moderate difficulty" understanding, remembering, and carrying out simple instructions. The ALJ rejected these assessments on the basis that: Plaintiff was able to become a citizen and procure the necessary paperwork; Plaintiff had been able to work in the past despite his psychiatric symptoms and had received unemployment, thereby holding himself out as able to work; Plaintiff was "stabilized" with treatment and medication and, during the period in question and had "no history of arrests or holds or psychiatric hospitalizations[;]"and Plaintiff did not assert any mental impairments in his application for benefits. (AR 36-37.) Additionally, the ALJ observed that Dr. Zada's opinion was inconsistent with Plaintiff's "daily activities and overall functioning" (AR 38), and "[Plaintiff's] presentation to various examiners for record and at the hearing and [Plaintiff's] own statement do not support the existence of cognitive limitations or depression of such significance that he could not perform simple work" (AR 37).

[11]      Dr. Ruddock opined that Plaintiff would have marked difficulty to maintain persistence and pace in a normal workplace setting and Dr. Zada opined that Plaintiff was markedly limited in his ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions, and perform at a consistent pace without an unreasonable number and length of rest periods.

[12]      Dr. Ruddock opined that Plaintiff would have marked difficulty responding to change in a normal workplace setting, and Dr. Zada opined that Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting.

[13]      Dr. Ruddock opined that Plaintiff would have moderate difficulty complying with job rules such as safety and attendance, and Dr. Zada opined that Plaintiff would be markedly limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.

26

reasons for discounting these portions of Dr. Ruddock and Dr. Zada's opinions in connection the ALJ's determination of Plaintiff's residual functional capacity are legally sufficient and supported by substantial evidence. Nevertheless, the ALJ is reminded that, on remand, if he makes a determination regarding Plaintiff's residual functional capacity, he must provide legally sufficient reasons for discounting the relevant opinions of the examining clinical psychologist and the treating psychiatrist – that is, clear and convincing reasons for opinions that are not contradicted and specific and legitimate reasons for opinions that are contradicted – and those reasons must supported by substantial evidence in the record.

## II. ALJ's Evaluation of the Medical Opinions Regarding Plaintiff's Physical Impairments

Plaintiff's second argument is that the ALJ improperly evaluated the medical evidence concerning his physical impairments, particularly the opinions provided by his treating doctors. (*See* Joint Stip. at 13-14.) For two and a half years, Plaintiff worked 37 hours a week as a landscaper. (AR 492.) On October 26, 2010, while doing his job, Plaintiff "experienced a stabbing pain to his low back" when he finished unloading several 50 pound bulks of branches, grass, and dirt. (AR 492, 493.) Plaintiff complained of constant severe mid to low back pain that radiated to the right side and was aggravated with lifting and bending. (AR 493.) Plaintiff continued working with pain until July 4, 2011. (AR 492.) Plaintiff sought workers' compensation for his injury. Plaintiff's amended alleged onset date for the purposes of his claim for social security benefits is April 15, 2012.

\\
\\
\\
\\
\\
\\

## A. Opinion of Dr. Rashti

### *1. Opinion of Dr. Rashti*

On January 7, 2011, Plaintiff had his initial evaluation with Jalil Rashti, M.D., the orthopedic surgeon who treated Plaintiff in connection with his workers' compensation claim. (AR 492, 494.) At that initial evaluation, Plaintiff exhibited a normal range of motion in his lumbar spine and lower extremities. (AR 494.) Examination of the thoracic and lumbar spine revealed tenderness of the thoracic and lumbar paravertebral muscles with spasm on the right side. (AR 495.) Plaintiff had a slight limp favoring his right side. (AR 495.) Dr. Rashti prescribed Tramadol, a highly addictive narcotic, and Gabapentin, a nerve pain medication and anticonvulsant, and he referred Plaintiff to physical therapy. (AR 495.) Dr. Rashti also ordered an MRI of Plaintiff's lumbar spine. (AR 495.) Plaintiff's January 11, 2011 MRI revealed a tear of the posterior annulus fibrosis at L5-S1, a lobulated right lateral recess disc bulge measuring 4.88mm, moderate facet arthrosis and, *inter alia*, ligamentum flavum thickening. (AR 497-98.) A subsequent July 29, 2011 cervical study of class III fibers revealed "the following impaired conduction: bilateral C3, left C4, bilateral C5, left C6, bilateral C7, and bilateral C8, T1, and T2." (AR 466.) The record contains treating notes reflecting treatment from the date of Plaintiff's initial evaluation, January 7, 2011, through August 1, 2014. On June 29, 2012, approximately two months after Plaintiff's alleged onset date, Dr. Rashti authored a Permanent and Stationary Report in which he assessed the following work restrictions: Plaintiff must avoid prolonged staying in one position such as sitting and standing, repeat bending and stooping, and heavy lifting, pushing, and pulling. (AR 468.)

\\
\\
\\
\\

28

2

### 2. *ALJ's Assessment of Dr. Rashti's Opinion*

The ALJ accorded Dr. Rashti's opinions "less weight" than the opinion of the consultative examiner, Sohail K. Afra, M.D., Diplomate of the American Board of Internal Medicine, who examined Plaintiff at Defendant's request on September 25, 2013 (AR 499-504). (AR 33.) Dr. Afra opined that Plaintiff was limited to the following: pushing, pulling, lifting, and carrying 20 pounds occasionally and 10 pounds frequently; walking and standing for six hours out of an eight hour day; sitting six hours out of an eight hour day; occasionally bending, kneeling, stooping, crawling, and crouching; and occasionally walking on uneven terrain, climbing ladders, working with heights. (AR 504.) In choosing to credit Dr. Afra's opinion over Dr. Rashti's, the ALJ explained that Dr. Rashti's findings were: (1) "internally inconsistent as his initial examination showed no neurological involvement" (AR 32); (2) inconsistent with the objective evidence and the record as a whole (*see* AR 32, 34); and (3) based primarily on Plaintiff's subjective complaints, which were of questionable credibility (*see* AR 32). As explained below, the ALJ's reasons for according less weight to Dr. Rashti's opinion are not specific, legitimate, and supported by substantial evidence in the record.

### 3. *Discussion*

#### a. *Internal Inconsistency*

The ALJ's first reason for discounting Dr. Rashti's opinion is the ALJ's determination that his opinions were internally inconsistent because, at Plaintiff's initial evaluation on January 7, 2011, Dr. Rashti did not find "neurological involvement." (AR 32.) This is not a specific and legitimate reason for discounting Dr. Rashti's June 2012 opinion. The ALJ identifies no portion of Dr. Rashti's June 2012 opinion that was premised on "neurological involvement" nor does he explain what portion of Dr. Rashti's January 7, 2011 opinion was

premised on the absence of "neurological involvement." (*See generally* AR 32.)  Without a more specific explanation from the ALJ, the Court cannot discern how the two opinions are internally inconsistent.   Additionally, to the extent that the ALJ's vague reference to "neurological involvement" is meant to refer to Plaintiff's radiculopathy and neuropathy, Dr. Rashti diagnosed Plaintiff with "thoracic and lumbar myalgia *with radiculitis*" and prescribed Gabapentin, a nerve pain medication, at Plaintiff's initial evaluation (AR 495) (emphasis added), and, in his June 2012 report, Dr. Rashti references a July 29, 2011 cervical study of class III fibers that revealed "the following impaired conduction:  bilateral C3, left C4, bilateral C5, left C6, bilateral C7, and bilateral C8, T1, and T2." (AR 466.)   In light of the foregoing, the ALJ's finding that Dr. Rashti's opinions are internally inconsistent based on the absence of neurological involvement in the initial evaluation is not a specific and legitimate reason supported by substantial evidence for according Dr. Rashti's opinions less weight.

### b. *Nexus with Dr. Rashti's Findings*

The ALJ's second reason for discounting Dr. Rashti's opinion is that the ALJ "question[ed] whether there is clear nexus between Dr. Rashti's findings and his opinion." (AR 33); *cf. Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (ALJ properly rejected treating physician's opinion where "treatment notes provide[d] no basis for the functional restrictions [physician] opined should be imposed on [claimant]").   Specifically, the ALJ explained that Dr. Rashti's opinion was "largely just a repetition of the opinion by Dr. Portnoff,[14] even though the later clinical findings by Dr. Rashti would indicate greater limitations." (AR 33.)

---

[14]     Ronald Portnoff, M.D., a board certified orthopedic surgeon and qualified medical evaluator, performed a Qualified Medical Re-evaluation in connection with Plaintiff's Workers' Compensation claim on January 4, 2012 (AR 672) and July 30, 2014 (AR 656).

1    This too is not a specific and legitimate reason supported by substantial evidence for

2    discounting Dr. Rashti's opinion.  First, contrary to the ALJ's finding, Dr. Rashti's opinion is

3    not "just a repetition" of Dr. Portnoff's January 4, 2012 opinion that Plaintiff could return to

4    his usual and customary duties but should avoid heavy lifting and carrying.  (AR 681.)  To

5    the contrary, Dr. Rashti *did* assess greater limitations than the ones assessed by Dr. Portnoff

6    – namely, he opined that, in addition to avoiding heavy lifting and carrying, Plaintiff must

7    also avoid prolonged staying in one position, repeat bending and stooping, and heavy

8    pushing and pulling.  (AR 468.)  Second, the Court sees no inconsistency – or lack of a

9    "clear nexus" – between these limitations and Dr. Rashti's treatment notes, which reflect,

10   *inter alia*, constant pain, recurring numbness and weakness in Plaintiff's legs, particularly his

11   left leg, and a recurring limp or guarded gait.  (*See, e.g.*, AR 473 (3/9/12 – low back pain,

12   feels left leg is weak, slow guarded gait), 472 (4/6/12 - constant low back pain, weakness),

13   471 (5/8/12 - constant lower back pain, weakness), 461 (1/4/13 - constant low back pain,

14   reduced motor strength in left leg), 618 (8/9/13 – constant pain, numbness and tingling, limp

15   favoring left), 622 (4/16/14 – constant pain, tingling and weakness in left legs, limping when

16   walking, diminished sensation to left foot), 621 (5/9/14 – pain is constant, numbness in both

17   legs but left leg is worse, limp favoring left leg), 620 (6/6/14 – constant low back pain,

18   limps, walks with and without cane).)  Finally, on July 30, 2014, Dr. Portnoff adopted some

19   of the restrictions assessed by Dr. Rashti – namely, Dr. Rashti's restrictions on repeat

20   bending and stooping and heavy pushing and pulling.  (*See* AR 668.)

21

22                              *c.  Inconsistent with Medical Record as a Whole*

23

24        The ALJ's third reason for assigning less weight to Dr. Rashti's opinion that Plaintiff

25   must avoid prolonged staying in one position, repeat bending and stooping, and heavy lifting,

26   pushing, and pulling is that it is inconsistent with "the majority of other objective findings."

27   (AR 34.)  "Taken as a whole," the ALJ explained, "the clinical records do not show

28   reproducible focal, sensory, motor, reflex or gait deficits nor do the imaging studies of record

31

suggest significant nerve root impingement. [Plaintiff] has no evidence of atrophy or muscle wasting . . . the record does not establish that [Plaintiff] needs an assistive device in order to ambulate, even for prolonged distances. Again, the preponderance of the evidence shows intact strength, normal gait, sensation, reflexes, and no signs of atrophy." (AR 32.) Ultimately, the ALJ concluded that "Dr. Rashti's findings are simply inconsistent with the majority of other objective findings. The preponderance of the evidence supports [Plaintiff's] ability to work." (AR 34.)

The ALJ's rationale does not meet the level of specificity required by the case law. "The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors,' are correct." *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988). Thus, merely listing the objective findings and stating that these factors point toward an adverse conclusion, without relating the objective findings to the specific medical opinions being rejected, is "inadequate." *Id.* at 422; *see also McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989) (the ALJ's rejection of the treating physician's opinion on the grounds that it was contrary to clinical findings in the record was "broad and vague, failing to specify why the ALJ felt the treating physician's opinion was flawed").

It is unclear from the ALJ's description of the clinical records what portion of Dr. Rashti's opinion is inconsistent with that evidence. Dr. Rashti's opinions appear to track his more than three years of treatment notes, which reflect constant pain, recurring numbness and weakness in Plaintiff's legs, particularly his left leg, and a recurring limp or guarded gait. (*See*, *e.g.*, AR 473 (3/9/12 – low back pain, feels left leg is weak, slow guarded gait), 472 (4/6/12 - constant low back pain, weakness), 471 (5/8/12 - constant lower back pain, weakness), 461 (1/4/13 - constant low back pain, reduced motor strength in left leg), 618 (8/9/13 – constant pain, numbness and tingling, limp favoring left), 622 (4/16/14 – constant pain, tingling and weakness in left legs, limping when walking, diminished sensation to left foot), 621 (5/9/14 – pain is constant, numbness in both legs but left leg is worse, limp

favoring left leg), 620 (6/6/14 – constant low back pain, limps, walks with and without cane).) Dr. Afra also observed that Plaintiff exhibited "reproducible pain" over his paraspinal areas and a reduced range of motion in his dorsolumbar region, including reduced range of flexion, lateral bending, and rotation. (AR 502.) Dr. Afra observed that Plaintiff's hip area and knee joints also showed a reduced range of motion with pain. (AR 502-03.) Finally, Dr. Afra observed that Plaintiff had mild difficulty walking on his toes and heels. (AR 503.)

There is also no obvious inconsistency between Dr. Rashti's opinions and the reported results of Plaintiff's lumbar MRI and cervical study. Indeed, at the December 8, 2015 administrative hearing, Ronald Gaylon, M.D., a board certified orthopedic surgeon, testified as a medical expert that a 4.8 mm disc bulge like the one revealed on Plaintiff's lumbar MRI is "a pretty large bulge" and could cause lumbar stenosis – narrowing – and put pressure on different nerves. (AR 84.) Dr. Gaylon indicated that this condition could cause persistent low back pain as well as weakness with decreased deep tender reflexes and necessitate the use of an assistive device for support. (AR 84.) Similarly, Ronald Portnoff, M.D., a board certified orthopedic surgeon and the qualified medical evaluator who, on January 4, 2012, performed a Qualified Medical Re-evaluation in connection with Plaintiff's Workers' Compensation claim (AR 672) indicated that Plaintiff's MRI findings indicated a potential for radicular symptoms (AR 682).

Nevertheless, the ALJ rejected some portion of Dr. Rashti's opinion – presumably his limitation on Plaintiff's ability to sit or stand for prolonged periods – in favor of Dr. Afra's less restrictive opinion without explaining how the clinical evidence the ALJ cited supported this rejection. Instead the ALJ stated only that "[t]he preponderance of the evidence supports [Plaintiff's] ability to work." (AR 34.) As explained, this is not a sufficiently specific reason for discounting a treating physician's opinion.

33

*d. Premised on Plaintiff's Less Than Credible Subjective Complaints*

The ALJ suggested that a fourth reason for discounting Dr. Rashti's opinion was that it was based on Plaintiff's less than fully credible statements. (*See* AR 32-33.) The ALJ characterized Plaintiff's "pain descriptions" as "somewhat murky" (AR 32) and "somewhat all inclusive" (AR 32-33) because they "included descriptions of alternately sharp, dull, aching pain, constantly present or present most of the time involving one or both legs and also including the mid-back." (AR 32.) The ALJ conceded that these descriptions could "reflect genuine changes over time, or reflect other legitimate factors," but he found it more probable that Plaintiff's pain descriptions were less than fully credible because Dr. Portnoff, the qualified medical examiner, stated that he considered Plaintiff's reports of radiculopathy "non-verifiable" (*see* AR 667 (Dr. Portnoff diagnosed Plaintiff with, *inter alia*, "non-verifiable lumbar radiculopathy")) and Plaintiff's subjective complaints not totally supported by objective findings (*id.*). (AR 32.)

Again, the ALJ fails to identify what specific portion of either Plaintiff's complaints to Dr. Rashti or Dr. Rashti's ultimate opinion is undermined by Plaintiff's purported lack of candor. *Cf. Thomas v Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (the ALJ must make findings in support of an adverse credibility determination that are sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony"). Further, the inconsistency between Plaintiff's subjective complaints and the objective evidence is not, by itself, a legally sufficient reason for finding Plaintiff's subjective complaints less than fully credible. *See Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (lack of objective medical evidence to support subjective symptom allegations cannot form the sole basis for discounting pain testimony); *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991). Moreover, contrary to the ALJ's finding, the record shows that Dr. Rashti's opinion was not based solely on Plaintiff's subjective complaints but, rather, also on three years of treatment records, which included physical examinations, a lumbar MRI, and a

cervical study.  Finally, Dr. Portnoff had initially observed that Plaintiff's MRI findings indicated a potential for radicular symptoms (AR 682), although he was unable to verify Plaintiff's subsequent complaints of radiculopathy.  In sum, the ALJ failed to articulate specific and legally sufficient reasons supported by substantial evidence in the record for finding that Plaintiff's pain descriptions to Dr. Rashti were less than fully credible.

In reaching this conclusion, the Court recognizes that elsewhere in the ALJ's opinion, the ALJ cited Plaintiff's activities of daily living as a basis for determining that Plaintiff's subjective complaints were less than fully credible.  (AR 30.)  Specifically, the ALJ noted that Plaintiff "watches television, does chores, drives, and attends religious ceremonies. Sometimes he walks his dog to the park and sits." (AR 30.)  However, an ALJ may rely on a plaintiff's daily activities to support an adverse credibility determination only when those activities either:  "contradict [the plaintiff's] other testimony"; or "meet the threshold for transferable work skills" – that is, where the plaintiff "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting."  *Orn*, 495 F.3d at 639; *Smolen v. Chater*, 80 F.3d 1273, 1284 n. 7 (9th Cir. 1996). Plaintiff's statements that he walks his dog a short distance to a park, watches movies on TV, attends a one-hour church service once a week, and, to the extent he is able, does "slow housework" (*see* AR 101-02, 136, 137, 138) are not inconsistent with his statements to Dr. Rashti, nor with Dr. Rashti's opinion, and do not meet the threshold for transferable work skills.  Accordingly, Plaintiff's activities of daily living are also not a legally sufficient reason supported by substantial evidence for finding Plaintiff's statements to Dr. Rashti less than fully credible and discounting Dr. Rashti's resulting opinion.

### e.  *Plaintiff did not Pursue More Aggressive Treatment*

Finally, the ALJ discounted Dr. Rashti's opinion in part because Plaintiff "has not ha[d] surgical recommendations or aggressive treatment, outside of the odd epidural, over

the years."[15]  (AR 32.)  According to the record, Plaintiff was unable to effectively treat his back pain and related symptoms with medication, physical therapy, acupuncture, and epidural injections.  (*See generally* AR 461-90, 617-23 (Dr. Rashti's treatment notes), 131-32 (Plaintiff's testimony).)  However, "the failure of [Plaintiff's] treating physician to recommend a more aggressive course of treatment, absent more, is not a legitimate reason to discount the physician's subsequent medical opinion about the extent of disability."  *Trevizo*, 871 F.3d at 677.  Accordingly, Dr. Rashti's purported failure to recommend surgery or more aggressive treatment is not a specific and legitimate reason supported by substantial evidence for discounting Dr. Rashti's opinion.

### B.  Conclusion

For the reasons stated above, the ALJ failed to articulate a specific and legitimate basis for discounting the opinion of Dr. Rashti, Plaintiff's treating physician of more than three years.  In light of the ALJ's improper evaluation of the opinions of Drs. Rashti, Ruddock, and Zada, the Court exercises its discretion to remand on this basis without reaching the merits of Plaintiff's remaining claims.  However, the ALJ is reminded that, on remand, he must articulate specific and legally sufficient reasons supported by substantial evidence in the record for discounting the opinions of Plaintiff's treating and examining physicians and for finding Plaintiff's statements about his symptoms and limitations less than fully credible.  In addition, in light of the medical expert's statement that he lacked sufficient evidence to

---

[15]  The Court notes that this District has generally rejected the view that epidural injections are "conservative" treatment.  *See, e.g., Hydat Yang v. Colvin*, No. CV 14-2138-PLA, 2015 WL 248056, at *6 (C.D. Cal. Jan. 20, 2015) ((citing, *inter alia*, *Harvey v. Colvin*, No. CV 13–5376–PLA, 2014 WL 3845088, at *9 (C.D. Cal. Aug. 5, 2014)); *but see also Robertson v. Berryhill*, No. CV 17-00571-JDE, 2017 WL 5634102, at *5 (C.D. Cal. Nov. 21, 2017) ("district courts in this Circuit have not followed a consistent path regarding whether epidural steroid injections constitute conservative treatment") (citing, *inter alia*, *Lederle v. Astrue*, No. 1:09–cv–01736 JLT, 2011 WL 839346, at *23 (E.D. Cal. Feb. 17, 2011) (characterizing epidural steroid injections as conservative treatment), *Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010) (assuming but not deciding powerful pain medications and injections can "constitute conservative treatment") (quotations omitted)).

render an opinion regarding Plaintiff's residual functional capacity (AR 90), it may be appropriate for the ALJ to develop the record further.

## III.    <u>Remand is Warranted</u>

The ALJ's errors in evaluating the opinions of Drs. Rashti, Ruddock, and Zada were not inconsequential to the ultimate nondisability determination, and the Court cannot reasonably discern the ALJ's path despite his errors, as would be required for the Court to find the errors harmless. *See Brown-Hunter v. Colvin*, 806 F.3d at 492. However, the Court also cannot say that further administrative proceedings would serve no useful purpose and, if the improperly discredited evidence were credited as true, the ALJ would be required to find Plaintiff disabled on remand, as would be required for the Court to remand for the calculation and award of benefits. *See Garrison*, 759 F.3d at 1020. To the contrary, given the length and complexity of the medical record, this case is not the "rare exception" in which the credit as true rule should be applied. *See Leon v. Berryhill*, 874 F.3d 1130, 1133 (9th Cir. 2017). Therefore, the Court remands for further consideration and, if appropriate, development of the record.

\\
\\
\\
\\
\\
\\
\\
\\
\\
\\
\\

**CONCLUSION**

For the reasons stated above, IT IS ORDERED that the decision of the Commissioner is REVERSED, and this case is REMANDED for further proceedings consistent with this Memorandum Opinion and Order.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for plaintiff and for defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY

DATE: October 25, 2018

_____
KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE